JOHN ANDREW FRITSCHIE
D.C. Bar No. 442624
Delaware Riverkeeper Network
River Resources Law Clinic
300 Pond Street
Bristol, Pennsylvania 19007
Phone: (267) 390-4138
Facsimile: (215) 369-1181

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **THE DELAWARE RIVERKEEPER**<br>**300 Pond Street**<br>**Bristol, Pennsylvania 19007**<br>**(215) 369-1188** | ) ) ) ) ) |  |
| **THE DELAWARE RIVERKEEPER**<br>**NETWORK**<br>**300 Pond Street**<br>**Bristol, Pennsylvania 19007**<br>**(215) 369-1188** | ) ) ) ) ) ) |  |
| **AMERICAN LITTORAL SOCIETY**<br>**Building 18 Sandy Hook**<br>**Highlands, New Jersey 07732**<br>**(732) 291-0055** | ) ) ) ) ) | **No.** |
| **CHEMICAL WEAPONS WORKING**<br>**GROUP**<br>**128 Main Street**<br>**Berea, Kentucky  40403**<br>**(859) 986-7565** | ) ) ) ) ) ) |  |
| **CLEAN WATER ACTION**<br>**100 N. 17th Street, 9th Floor**<br>**Philadelphia PA 19103**<br>**(215) 640-8800** | ) ) ) ) ) |  |
| **DELAWARE AUDUBON**<br>**45 Shady Lane**<br>**Dover, Delaware 19901**<br>**(302) 428-3959** | ) ) ) ) | **Complaint for Declaratory and**<br>**Injunctive Relief** |

**NEW JERSEY AUDUBON SOCIETY** )
**11 Hardscrabble Road** )
**Bernardsville, New Jersey 07924** )
**(908) 204-8998** )
 )
**and** )
 )
**NEW JERSEY ENVIRONMENTAL** )
**FEDERATION** )
**New Jersey Environmental Federation** )
**1002 Ocean Avenue** )
**Belmar, New Jersey 07719** )
**(732) 280-8988** )
 )
   **Plaintiffs,** )
 )
   **v.** )
 )
**UNITED STATES ARMY** )
**101 Army Pentagon** )
**Washington, DC 20310-0101** )
 )
  **and** )
 )
**UNITED STATES SECRETARY OF** )
**DEFENSE** )
 )
   **Defendants,** )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. In this action, Plaintiffs challenge the failure of the United States Army and the

Secretary of Defense to comply with the requirements of the various statutes

governing the elimination of the Nation's biological and chemical weapons stores,

as well the National Environmental Policy Act, in selecting the DuPont facility in

Deepwater, New Jersey to receive partially "neutralized" VX nerve gas shipments

for further treatment and to discharge the resulting highly caustic material into the Delaware River and Estuary.

2.    Congress explicitly required that the Nation's stores of biological and chemical weapons be fully disposed of in specially constructed sole use facilities and further explicitly required that no biological or chemical weapons be transported across State lines or handled in other facilities prior to complete destruction and neutralization.  Yet the Army is relying on the persulfate oxidation step at the DuPont facility to achieve complete removal of VX to below detection limits, after shipment across State lines.

3.    While the Army has undertaken generic, program-level environmental review of the "off-site" disposal option, it has failed to tier the analysis to the required site-specific environmental impact statement or assessment.  Moreover, the Army has failed to analyze alternative off-site disposal locations in any NEPA document. The NEPA documents prepared by the Army are utterly devoid of description, analysis and consideration of the use of the DuPont facility and discharge of the caustic VX hydrolysate ("CVXH") waste and by-products into the Delaware River and Estuary.

4.    Further, the Army fails to consider an obvious alternative by conflating its desires for accelerated neutralization and off-site disposal.  The Army's original proposal and NEPA documentation called for a slower neutralization process and complete treatment and neutralization on-site, as required by the laws governing the destruction of the Nation's biological and chemical weapons stores.  In the supplemental EA, the Army adopted the 1998 proposal as the "no action" or

status quo alternative and proposed a single new alternative of accelerated partial neutralization combined with off-site disposal. The Army identifies a "possible backup accelerated approach" that would also allow accelerated neutralization through the on-site "construction of an above-ground tank farm for storage of the hydrolysate to accommodate additional SCWO process development." EA at 2-1. However, this alternative was summarily eliminated from consideration because it "would add cost and would delay complete disposal" of the CVXH, *id*., despite the fact that it would meet the primary identified purpose and need of the proposed action by accelerating the elimination of the threat of terrorist attack on actual VX nerve agent stockpiles.

5.  Finally, the supplemental EA fails to address the risks of transport of CVXH from intentional attack or theft, rather than simply accidental releases. By eliminating the supercritical water oxidation of CVXH prior to shipment off-site in the proposed action, the Army will be transporting constituents of VX that could reconstitute under suitable conditions, such as a significant drop in pH. Such reconstitution is unlikely to occur accidentally. "The most likely means by which a [sufficiently] significant pH drop could occur is by addition of a strong acid, which would be a deliberate action." Bruce E. Rittman, Ph.D., Department of Civil and Environmental Engineering, Northwestern University, "Treatment of VX Hydrolysate by PermaFix of Dayton" (October 6, 2003). The failure to consider the potential for malicious wrongdoing during the transport of CVXH is particularly glaring considering the ostensible impetus for hastened off-site treatment was the terrorist attacks of September 11, 2001.

6.     Plaintiffs seek to enjoin shipment of CVXH to the DuPont facility in Deepwater, New Jersey due to the serious and unexamined environmental and public health implications pending a site-specific environmental impact statement.  Plaintiffs in no way seek to enjoin accelerated neutralization of VX at the Newport facility, which is already underway with significant storage capacity already constructed on-site.  Interim on-site storage could be on a smaller scale initially and need only be sufficient to store as much waste as is produced from the treatment of VX during the length of the requested injunction, i.e. until NEPA is complied with fully by analyzing and comparing site-specific alternatives of on-site disposal, the proposed action of discharging into the Delaware River and Estuary, and other off-site disposal locations and methods.  The Army was advised as early as June 2001 that temporary on-site storage capacity was needed to mitigate the impacts of anticipated delays.

7.     Considering that over four years has passed since the release of the Army's supplemental EA – during which time the Army dropped plans to utilize a disposal facility in Dayton, Ohio due to public opposition – slight further delay to require compliance with federal law and enable local citizens meaningful input will not cause significant harm to the Army and is in the public interest.  The Chemical Weapons Convention allows the United States to seek an extension of five years, until 2012, to destroy all stockpiles and the United States, despite substantial problems in the program, is well ahead of Russia in destroying our chemical weapons stockpiles.  An inferior process should not be utilized in haste and in violation of our laws to the detriment of our environment and possibly

additional risk to the citizens of New Jersey and Delaware, as well as those along the transportation route.

## JURISDICTION

8.  This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction); 5 U.S.C. § 702 (Administrative Procedure Act); and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2202 (declaratory and injunctive relief).

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because it is the location of the headquarters of the Defendant agency and official with ultimate decisionmaking authority and legal responsibility.

10. Plaintiffs have no adequate remedy at law.  Unless this Court grants the requested relief, the Defendants' actions will continue to cause irreparable harm to the environment, to Plaintiffs, and to the public in violation of federal law and the public interest.  No monetary damages or other legal remedy could adequately compensate Plaintiffs or the public for these harms.  Plaintiffs are persons adversely affected or aggrieved by federal agency action within the meaning of section 702 of the Administrative Procedure Act.

## PARTIES

**A.    PLAINTIFFS**

11. Plaintiff, Delaware Riverkeeper, a full time privately funded ombudsman who is responsible for the protection of the waterways in the Delaware River Watershed. The Delaware Riverkeeper advocates for the protection and restoration of the

ecological, recreational, commercial and aesthetic qualities of the Delaware River, its tributaries and habitats.

12. Plaintiff, Delaware Riverkeeper Network ("DRN") is an affiliate of the American Littoral Society and was established in 1988 to protect and restore the Delaware River, its tributaries and habitats. To achieve these goals, DRN organizes and implements streambank restorations, a volunteer monitoring program, educational programs, environmental advocacy initiatives, recreational activities, and environmental law enforcement efforts throughout the entire Delaware River watershed—an area which includes portions of New York, New Jersey, Pennsylvania and Delaware. The DRN is a membership organization with 6,500 members throughout the Watershed. DRN members canoe, birdwatch, hike, and participate in other recreational activities throughout the Watershed, including in the Estuary portion of the Delaware River Watershed.

13. Plaintiff American Littoral Society ("ALS") is a non-profit organization with offices in Monmouth, Ocean, and Cape May County, New Jersey. ALS was established to promote the study and conservation of marine life and its habitat, specifically in coastal zones. For over 40 years, ALS has served, particularly in New Jersey, as a lead organization, in developing public support for the preservation of coastal habitat, including wetlands, uplands, dunes, seashore and other types of coastal lands. ALS has approximately 5100 members nationally, 2200 of whom reside in New Jersey.

14. Plaintiff Chemical Weapons Working Group (CWWG) is a national grassroots coalition of citizens and citizen organizations near U.S. chemical weapons

stockpile sites of Alabama, Arkansas, Colorado, Indiana, Kentucky, Maryland, Oregon, Utah and in the Pacific. The CWWG's mission is to promote environmental justice and protect public health of all citizens affected by the U.S. chemical weapons legacy by 1) demanding safe, non-incineration technologies for disposal of chemical weapons and secondary wastes; and 2) government accountability through direct citizen involvement in the chemical weapons program decision-making process. The CWWG believes that where citizens are encouraged and empowered, solutions to our lethal chemical weapons legacy will follow.

15.     Plaintiff Clean Water Action is a national non-profit organization with 700,000 members of diverse people and groups, joined together to protect our environment, health, economic well-being, and community quality of life. Clean Water Action has 80,000 members in Pennsylvania, over half of them residing in the Delaware River basin, and offices in Philadelphia, Allentown and Pittsburgh. Goals of Clean Water Action include clean, safe and affordable water; prevention of health-threatening pollution; creation of environmentally-safe jobs and businesses; and empowerment of people to make democracy work. Clean Water Action organizes strong grassroots groups and coalitions, and campaigns to elect environmental candidates and solve environmental and community problems. Since establishment of its Philadelphia office in 1987, Clean Water Action has worked to protect the Delaware River and its tributaries from pollution, preserving habitat for plant and animal species, protecting the recreational assets

of the river, and safeguarding the quality of the drinking water it provides to millions of people.

16.    Plaintiff Delaware Audubon is a conservation organization incorporated in Delaware as a non-profit organization in 1977.  Delaware Audubon is a statewide chapter of the National Audubon Society and is dedicated to developing a better appreciation of our natural environment and working for species and habitat protection and conservation.  Delaware Audubon consists of over 1,500 members throughout the state advocating on a wide range of environmental issues and sponsoring programs, field trips and school education. The organization is focused on protection of the Delaware Bay and the Coastal Zone which is considered a globally Important Bird Area.  Discharges from the DuPont Secure Environmental Treatment Facility located at Deepwater, New Jersey could have a negative impact on the environment of the Delaware Estuary, which is of great concern to Delaware Audubon members.

17.    The New Jersey Audubon Society ("NJAS") is a privately supported, not-for profit, statewide membership organization founded in 1897 and wholly independent of the National Audubon Society.  The New Jersey Audubon Society fosters environmental awareness and a conservation ethic among New Jersey's citizens; protects New Jersey's birds, mammals, other animals, and plants, especially endangered and threatened species; and promotes preservation of New Jersey's valuable natural habitats. New Jersey Audubon's Board of Directors, professional staff, members, and volunteers are committed to sound conservation practices, programs, and legislation; thorough education about the natural

environment and the advancement of knowledge about New Jersey's flora and fauna, and their relationships to the habitats on which they depend.   Consistent with its mission, NJAS is extremely concerned about adverse impacts on the aquatic ecosystem that may result from the Army's plan for shipment to and treatment at Deepwater of the toxic nerve agent VX.  The Delaware Bay Shore is an Important Bird Area and provides essential habitat and contributes to the viability of New Jersey's native avian population.

18.    Plaintiff New Jersey Environmental Federation ("NJEF"), the state chapter of the national Clean Water Action, was established in 1983 to protect New Jersey's environment and public health from toxic threats to water, air and land.   To achieve these goals, NJEF conducts grassroots organizing campaigns, as well as provides technical assistance, training, outreach and educational programs to increase public official understanding of environmental issues and promote environmentally sound policies.  NJEF fosters environmental consensus building, enabling diverse constituencies to find common ground and work together for a clean, safe environment.  The NJEF is a membership organization with 70,000 individual members and 100 member groups located throughout the state of New Jersey, including the Delaware River Watershed and Estuary.  NJEF and its members have a long history of enjoying the recreational activities of the Watershed and Estuary, as well as undertaking grassroots campaigns to protect and restore the ecological integrity of the region's waters.

19.    Plaintiffs brings this action of behalf of their members, including many who live in the vicinity of the Delaware River and Estuary, or rely on them for recreational,

professional, or aesthetic use, and will suffer injuries from the discharge of neutralized VX nerve gas by-products into the Delaware River ecosystem, as well as from the associated public perception of a polluted river and contaminated fisheries. Also Plaintiffs' members suffer informational and procedural injuries from the failure of the Defendants to comply with NEPA and the failure to generate the required information on effects of the pollution on the river and estuary, as well as potential alternative disposal locations and methods.

20.    Plaintiffs also bring this action on behalf of the organizations themselves. Plaintiff organizations have suffered informational and procedural injuries from the failure of the Defendants to comply with NEPA and the failure to generate the required information on effects of the pollution on the river and estuary, as well as potential alternative disposal locations and methods.

**B.     DEFENDANTS**

21.    Defendant United States Army is a federal agency within the United States Department of Defense and proposes to ship neutralized VX nerve gas to the DuPont facility in Deepwater, New Jersey.

22.    Defendant Secretary of Defense, sued in the official capacity as head of the Department of Defense, is responsible for complying with Federal laws governing the transport, destruction and disposal of the Nation's chemical weapons stores.

**STATUTORY FRAMEWORK AND FACTS GIVING
RISE TO PLAINTIFF'S CLAIMS FOR RELIEF**

**RELEVANT STATUTES**

**A.     <u>CHEMICAL WEAPONS TRANSPORT AND DISPOSAL LAWS AND
REGULATIONS</u>**

23. Under the Defense Authorization Act of 1986 ("DAA"), 50 U.S.C. § 1512 et. seq., and Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, Jan. 13, 1993, 32 I.L.M. 800 (hereinafter "Chemical Weapons Convention of 1993" or "CWC"), the Secretary of Defense is required to destroy certain chemical munitions by 2007. 50 U.S.C. § 1521(b)(2).

24. The CWC contains an interim requirement to destroy 45% of stockpiles by 2004; the United States received an extension of this deadline until 2007 and will seek an extension of an additional five years to destroy all stockpiles as allowed by the CWC. General Accounting Office, *Chemical Weapons, Destruction Schedule Delays and Cost Growth Continue to Challenge Program Management*, Testimony Before the Subcommittee on Terrorism Unconventional Threats and Capabilities, Committee on Armed Services, House of Representatives, GAO-04-684T (2004) at 2.

25. In undertaking the dismantling and disposal of the Nation's chemical weapons stockpiles, the DAA requires the Secretary to provide "maximum protection for the environment [and] the general public." 50 U.S.C. § 1521(c)(1)(A).

26. The DAA states that "[t]he Secretary of Defense may not transport any chemical munition that constitutes part of the chemical weapons stockpile out of the State in which that munition is located on the date of the enactment of this Act [enacted Oct. 5, 1994] and, in the case of any such chemical munition not located in a State on the date of the enactment of this Act [enacted Oct. 5, 1994], may not transport any such munition into a State." 50 U.S.C. § 1512a(a).

27.     The DAA further requires that in carrying out the required destruction of the Nation's chemical weapons stockpile the Secretary of Defense construct "adequate and safe facilities designed solely for the destruction of lethal chemical agents and munitions."  50 U.S.C. § 1521(c)(1)(B).

28.     The required sole use chemical weapons destruction facilities, "when no longer needed for the purposes for which they were constructed, [must] be disposed of in accordance with applicable laws and regulations and mutual agreements between the Secretary of the Army and the Governor of the State in which the facility is located."  50 U.S.C. § 1521(c)(2).

29.     "Facilities constructed to carry out [section 1521] may not be used for a purpose other than the destruction of the stockpile of lethal chemical agents and munitions that exists on November 8, 1985."  50 U.S.C. § 1521(c)(3)(A).

30.     The DAA further provides "On and after the date of enactment of this Act [enacted Oct. 7, 1970], no chemical or biological warfare agent shall be disposed of within or outside the United States unless such agent has been detoxified or made harmless to man and his environment unless immediate disposal is clearly necessary, in an emergency, to safeguard human life."  50 U.S.C. § 1518.

**B.     NEPA AND IMPLEMENTING REGULATIONS**

31.     "NEPA . . . makes environmental protection a part of the mandate of every federal agency and department," Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 449 F.2d 1109, 1112 (D.C.Cir. 1971).  Perhaps the greatest importance of NEPA is to require…agencies to *consider* environmental issues just as they consider other matters within their mandates."  *Id*.  (Emphasis

in the original.)  NEPA's essential purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1 (c).  The Council on Environmental Quality ("CEQ") – an agency within the Executive Office of the President – has promulgated regulations implementing NEPA.  See 40 C.F.R. §§ 1500-1508.

32.   To accomplish its purpose, NEPA requires that all agencies of the federal government must prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment . . .." 42 U.S.C. § 4332(2)(C).  This statement, known as an Environmental Impact Statement ("EIS"), must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id*.

33.   "Major Federal actions" requiring preparation of an EIS include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . .."  40 C.F.R. § 1508.18(a).

34.   An agency may first prepare an environmental assessment ("EA"), a short concise document, to determine whether a proposed action may have significant environmental impacts and therefore require the preparation of an EIS.

35.   Regulations promulgated by the CEQ to implement NEPA delineate some of the factors that must be considered in determining the significance of an action,

including the following factors relevant to this case – any one of which alone could warrant production of an EIS:

> . . .

> (2) The degree to which the proposed action **affects public health or safety**.

> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, **wetlands, wild and scenic rivers, or ecologically critical areas**.

> (4) The degree to which the **effects on the quality of the human environment are likely to be highly controversial**.

> (5) The degree to which the **possible effects on the human environment are highly uncertain or involve unique or unknown risks**.

> (6) The degree to which the action **may establish a precedent for future actions** with significant effects or represents a decision in principle about a future consideration.

> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. **Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts**.

> . . .

> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

> (10) **Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment**.

40 C.F.R. § 1508.27(b) (emphasis added).

36.    An EIS, or at minimum an EA, must be produced for all major federal actions unless the project fits within a "categorical exclusion" under the agency's regulations because they have been determined to have no more than minimal environmental impacts.

37.    Army regulations delineate actions that can be categorically excluded from NEPA and do not require the preparation of an EA or EIS.  32 C.F.R. § 651.11(c). Under Army regulations, "actions that degrade the existing environment or are environmentally controversial or adversely affect environmentally sensitive resources will require an EA." *Id*.

38.    An action cannot be categorically excluded from NEPA review if the action has been segmented.  32 C.F.R. § 651.29(a).  Army regulations explain that:

> Segmentation can occur when an action is broken down into small parts in order to avoid the appearance of significance of the total action. An action can be too narrowly defined, minimizing potential impacts in an effort to avoid a higher level of NEPA documentation.

*Id*.

39.    A categorical exclusion is also inappropriate if exceptional circumstances exist. 32 C.F.R. § 651.29(a).  Examples of exceptional circumstances include:

> (1) **Reasonable likelihood of significant effects on public health, safety, or the environment**.

> (2) **Reasonable likelihood of significant environmental effects (direct, indirect, and cumulative)**.

> (3) **Imposition of uncertain or unique environmental risks**.

> (4) Greater scope or size than is normal for this category of action.

(5) **Reportable releases of hazardous or toxic substances as specified in 40 CFR part 302, Designation, Reportable Quantities, and Notification**.

(6) Releases of petroleum, oils, and lubricants (POL) except from a properly functioning engine or vehicle, application of pesticides and herbicides, or where the proposed action results in the requirement to develop or amend a Spill Prevention, Control, or Countermeasures Plan.

(7) When a review of an action that might otherwise qualify for a Record of Non-applicability (RONA) reveals that air emissions exceed de minimis levels or otherwise that a formal Clean Air Act conformity determination is required.

(8) Reasonable likelihood of violating any federal, state, or local law or requirements imposed for the protection of the environment.

(9) **Unresolved effect on environmentally sensitive resources, as defined in paragraph (c) of this section**.

(10) Involving **effects on the quality of the environment that are likely to be highly controversial**.

(11) **Involving effects on the environment that are highly uncertain, involve unique or unknown risks, or are scientifically controversial**.

(12) **Establishes a precedent (or makes decisions in principle) for future or subsequent actions that are reasonably likely to have a future significant effect**.

(13) **Potential for degradation of already existing poor environmental conditions**. Also, initiation of a degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

(14) **Introduction/employment of unproven technology**.

32 C.F.R. § 651.29(b) (emphasis added).

40.    A categorical exclusion is also inappropriate if there are unresolved adverse affects on environmentally sensitive resources, including:

(1) Proposed federally listed, threatened, or endangered species or their designated critical habitats.

(2) Properties listed or eligible for listing on the National Register of Historic Places (AR 200-4).

(3) Areas having special designation or recognition such as prime or unique agricultural lands; **coastal zones**; designated wilderness or wilderness study areas; **wild and scenic rivers**; National Historic Landmarks (designated by the Secretary of the Interior); **100-year floodplains; wetlands; sole source aquifers (potential sources of drinking water)**; National Wildlife Refuges; National Parks; **areas of critical environmental concern; or other areas of high environmental sensitivity**.

32 C.F.R. § 651.29(c) (emphasis added).

41.    Types of actions that normally qualify for a categorical exclusion are listed in 32 C.F.R. Part 651 Appendix B.  Actions involving hazardous materials that may fall under a categorical exclusion include the use of gauging devices and analytical instruments, emergency response, sampling, routine management, and research in enclosed facilities.

42.    Section 102(2)(E) of NEPA requires that every agency must also "study, develop, and describe alternatives to recommended courses of action . . .." 42 U.S.C. § 4332(2)(E).

43.    The CEQ regulations describe the consideration of alternatives as "the heart of the environmental impact statement."  40 C.F.R. § 1502.14.

44.    The purpose of the requirement to consider alternatives is "to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means."  *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974).

45.   "No decision is more important that delimiting what these 'reasonable alternatives' are [since] [o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. United States Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997).

46.   CEQ regulations define "cumulative impact" at 40 C.F.R. 1508.7: "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or persona undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

47.   CEQ has emphasized the importance of considering cumulative impacts.  In its 1997 report entitled "Considering Cumulative Effects Under the National Environmental Policy Act," CEQ notes that "[e]vidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time."  CEQ Report at 1.

48.   CEQ has determined that unintended consequences on the human environment continue to occur from federal agency decision-making and that "is largely attributable to this incremental (cumulative) impact."  *Id*.

49.   According to CEQ:  "The passage of time has only increased the conviction that cumulative effects analysis is essential to effectively managing the consequences of human activities on the environment.  The purpose of cumulative effects

analysis, therefore, is to ensure that federal decisions consider the full range of consequences of actions. Without incorporating cumulative effects into environmental planning and management, it will be impossible to move towards sustainable development, i.e., development that meets the needs of the present without compromising the ability of future generations to meet their own needs (World Commission on Environment and Development 1987; President's Council on Sustainable Development 1996). To a large extent, the goal of cumulative effects analysis, like that of NEPA itself, is to inject environmental considerations into the planning process as early as needed to improve decisions. If cumulative effects become apparent as agency programs are being planned or as larger strategies and policies are developed then potential cumulative effects should be analyzed at that time." CEQ Report at 3.

50. "Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20.

51. "'Tiering' refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

52. "Tiering is appropriate when the sequence of statements or analyses is:

20

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis [or]

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."

40 C.F.R. § 1508.28.

53.    An agency may prepare "a broad environmental impact statement" on a general program or policy decision, so that "subsequent [site specific] statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20.

## FACTS

**A.    The Recovering Delaware River and Estuary's Ecological, Economic and Recreational Values**

54.    The Delaware River is the longest free flowing river east of the Mississippi River with most of the upper reaches designated as Wild and Scenic.

55.    Delaware Bay is home to the world's largest population of horseshoe crabs, whose eggs are a primary food source for the second largest population of

migrating shorebirds in North America.  In 1988, bird watchers spent an estimated $5.5 million in the Cape May, New Jersey area alone.

56.    The Delaware River and Estuary have been plagued by pollution problems but efforts have been successful to restore components of the ecosystem to better health.  For example, the upper estuary was once subject to seasonal episodes of anoxia (extremely low dissolved oxygen conditions) that have been overcome by improved waste-water treatment.  The elimination of periodic anoxic conditions has allowed blue crabs to recolonize tidal fresh waters and shad to reestablish their successful spawning migrations.

57.    In 1987, Congress identified the Delaware Estuary as an estuary of national importance and warranting priority consideration for inclusion in the National Estuary Program.

58.    In 1988, the governors of Delaware, New Jersey and Pennsylvania nominated the Delaware for inclusion in the U.S. Environmental Protection Agency's National Estuary Program and it was accepted.

59.    In 1995, the Delaware Estuary Program published a report entitled "Living Resources of the Delaware Estuary."  Its introduction states:

> The importance of protecting the Delaware Estuary is well known to residents of the estuary regions of New Jersey, Pennsylvania, and Delaware, whose local economies continue to rely, in large part, upon a variety of resource-based activities.  In all three of these states, traditional land uses, such as farming, hunting, fishing and trapping, continue to be an important part of the fabric of local life.  Increasingly, natural resource-based tourism is also becoming a significant economic factor, particularly as national and international recognition is given to the urgency of protecting the unspoiled areas, indigenous and migratory wildlife, and traditional uses of our estuary.  All of these activities coexist in a region that also absorbs a wide range of residential, commercial, and industrial

uses, and where densely populated urban centers are in close proximity to rural open spaces, and to the estuary itself.

Living Resources at xix.

60.    The Delaware Estuary Program described the ecological values of the Delaware

Estuary thusly:

> Estuaries are extremely productive ecosystems, harboring many species that are commercially valuable or that indirectly support commercially valuable species as food sources.  Oysters have been an important resource in the Delaware Bay since before the turn of the eighteenth century.  Oysters, blue mussels, clams, and crabs continue to be harvested.  Bottom-dwelling organisms of estuarine communities are important food sources for fish, turtles, and waterfowl.  Bottom-dwellers function as indicators of environmental quality by concentrating materials within their tissues.  Oysters and other filter feeders of hard and soft substrates also indicate water quality because they feed on plankton and can to some degree control nutrient loadings and eutrophication.  Oyster reefs and other hard substrates provide microhabitats for other organisms, including juvenile fishes.

> Intertidal mudflats and sandflats of estuarine waters support numerous invertebrate species that provide food for migrating and breeding shorebirds.  The Delaware Estuary is a highly significant resource for shorebirds, as evidenced by peak counts of up to 400,000 shorebirds during the height of the migratory season.  Large numbers of semipalmated lings, dunlins, and dowitchers feed on these flats each year.  The Delaware Estuary is also a significant breeding area for the horseshoe crab.

Living Resources at 21-22 (citations omitted).

61.    The status and trends of the Delaware Estuary is described thusly:

> A fishery for knobbed whelk and channel whelk has recently developed in the lower Delaware Bay, but northern quahog (hard clam) numbers have declined well below historic levels and no longer support a fishery.  Oyster production in Delaware Bay has also substantially declined, primarily due to disease and low success in seed beds, although average volume is currently twice that of the 1950s and 1960s when disease began to affect oyster populations.

Pollution is not a substantial problem to oyster populations in the Delaware Bay; however, water quality in the Delaware Estuary is variable. The area from Trenton to Philadelphia generally meets federal water-quality standards, but the region from Philadelphia to Marcus Hook, Pennsylvania, falls below these standards. Various pollution sources have increased turbidity and lowered oxygen levels in this portion of the estuary. Although water quality improved in the vicinity of Philadelphia in the 1980s as a result of better waste treatment, pollution-tolerant organisms continue to dominate bottom sediments in this area.

Living Resources at 22 (citations omitted).

62.     Phytoplankton are an essential component of an estuary ecosystem providing food

and oxygen, but also a potential source of harmful algal blooms.

The Delaware Estuary is dominated by water flow from the Delaware River and has been characterized as a nutrient-rich system, containing some of the highest levels of nitrogen and phosphorus of any of the world's estuaries. The various water-quality parameters (nutrients, total suspended solids, etc.) and the degree of stratification in the estuary are influenced by the seasonal discharge pattern of the Delaware River. This flow, and the nutrients and suspended solids it contains will affect the abundance and productivity of phytoplankton throughout the year.

. . .

The high concentrations of nutrients that characterize the Delaware Estuary provide the potential for this system to support increased growth of phytoplankton. However, because the high suspended sediment load with the estuary has reduced the amount of light available to the phytoplankton, they have not fully utilized these nutrients. This does not rule out the possibility that extensive bloom conditions could develop with the Delaware Estuary, and should be considered in the estuary's management plan. A significant bloom event may reduce the amount of oxygen available to other biota within the water, possibly producing toxins, and influence water quality (e.g., increase turbidity and reduce levels of light into the water column).

Living Resources at 26, 28 (citations omitted).

63.     At the next highest trophic level, copepods provide the major food supply for

nursery fish, including the larvae of important commercial fish species.

> Nursery areas within the Delaware Estuary provide protection and abundant food suitable for most young, developing fishes in this region. These habitats take on increasing importance with the growing scientific consensus that the larval stage is the most critical development stage in determining future stocks of adult fish . . . In the Delaware Estuary, copepods clearly dominate numerically in the zooplankton throughout the year . . . Those habitat requirements that determine copepod survival and production in the Delaware Estuary therefore determine survival of the critical larval stage of estuarine-using fishes.
>
> . . .
>
> Like most coastal-plain estuaries, the Delaware Estuary is characterized by large variations in physical and chemical factors that allow only a few adaptable copepod species to set up permanent residence. These species are evolutionarily unique in their physiological flexibility and cannot be replaced by freshwater or offshore species. They are also vulnerable to toxic substances. Given their high productivity and relatively short generation times, they are likely to recover fairly quickly from single, short-term events such as an oil spill or an anoxic event. More of a concern is the reduced productivity of these fish food organisms as a result of chronic exposure to sublethal levels of pollutants such as halogenated hydrocarbons and metals. Sublethal can alter adaptive physiologies and behaviors that have evolved for optimal survival and reproductive success.
>
> Studied metals and toxic organic substances such as phenols in the water column of the Delaware Estuary generally show concentration increases from Trenton to Marcus Hook, followed by decreases to the mouth of the bay. Since the 1970s and early 1980s, metal levels in the water column have generally declined, although nickel has increased upstream from Delaware Bay. Toxic organic compounds such as phenols, however, are increasing throughout the estuary.

Living Resources at 33-34, 37 (citations omitted).

64.    To protect copepods, the Delaware Estuary Program recommends "[m]inimizing

discharge of metals and organic toxins into the Delaware River, especially in the

urban sections where such loading is already high."  Living Resources at 40.

65.    Juvenile fish rely heavily on mysid crustaceans as a food source.

> Mysids are small crustaceans that occur in shallow coastal and
> estuarine waters and contribute to the ecology of the Delaware
> Estuary.  They are omnivores, consuming algae, plankton, and
> plant detritus, and in turn serve as prey for invertebrates and
> juvenile fish, particularly weakfish, American shad, summer
> flounder, hakes, and striped bass in the Delaware Estuary.
>
> Mysids grow and reproduce year-round in the estuary, despite a
> variation in temperature of 0° to 25°C (32° to 77°F).  They are
> known to be sensitive to dissolved toxic substances in the water,
> particularly in warmer, summertime conditions . . .
>
> The important ecological role of mysids is a function of their body
> size, diet, and locomotion.  As young fish mature, their mouths as
> well as the rest of their bodies get larger and they are able to
> consume larger and larger prey.  Weakfish, for example, consume
> phytoplankton and small zooplankton . . . at first, shifting later to
> larger zooplankton such as copepods . . ..  Mysids are the next step:
> *N. amiericana*'s body length of 2-16 millimeters is ideal before
> these fish become large enough to feed on other fish.  Only the
> ephemeral larval stages of fish and decapod crustaceans (crabs,
> shrimp, lobster) and the closely related crustaceans (amphipods
> and isopods) have a body size similar to the size of mysids. . . .
>
> Fisheries research suggests that mysids are especially important in
> the diet of juvenile weakfish, American shad, summer flounder,
> hakes, and striped bass in the Delaware Estuary.
>
> . . .
>
> Mysids are known to be unusually sensitive to dissolved toxic
> substances, and one subtropical species is used in standard
> bioassays by the U.S. Environmental Protection Agency.  Because
> of their activity and high rate of metabolism, mysids are likely to
> have dissolved-oxygen requirements similar to those of fish.
> Laboratory tests in which samples of *N. americanan* were exposed
> to naphthalene demonstrated that low concentrations of petroleum
> hydrocarbons affected their survival and metabolic rate.  The

species sensitivity to the toxin increased at higher temperatures; in
the Delaware Estuary this would typically be in late summer.

Living Resources at 59, 63, 64.

66.    Two of the most economically important species in the Delaware Estuary are the

eastern oyster and blue crab.

The eastern oyster, *Crassostrea virginica*, is a dominant bottom-
dwelling invertebrate in much of Delaware Bay and has been a
commercially important species since the eighteenth century.
Natural beds or reefs (called seed beds) cover much of the upper
bay and produce the seed oysters that are essential for the oyster
industry.  Oyster reefs, in addition, provide habitat for numerous
other invertebrates, which in turn are food for the bay's fish
population.  Oysters obtain their food by filtering microscopic
plankton from the water and in doing so are capable of removing
and concentrating many materials in their tissues, including toxins
and human pathogens such as viruses and bacteria.

Living Resources at 105.

67.    The significant loss of oysters in recent years has led to careful management and

restrictions on harvest.  Through investments of public resources, sparked by New

Jersey legislative action in 1996, shell planting has improved the oyster to the

point where the Bay's oyster beds are again open to harvest and the struggling

industry is recovering.  *See* U.S. Army Corps of Engineers, *Delaware Bay Oyster*

*Restoration Project Delaware and New Jersey: FINAL Environmental Assessment*

(April 2006).

68.    The blue crab stocks in the Delaware and Chesapeake Bays support the Mid-

Atlantic's most important inland fishery.

In most years, the catch in Chesapeake Bay provides more than 50
percent of the commercial landings of this species nationwide.
Landings in Delaware Bay are considerably lower, but still
represent an important regional fishery.  While it is difficult to
estimate the magnitude of recreational landings in Delaware Bay,

27

there is a well-developed sport fishery along both the Delaware and New Jersey shores, and in recent years this fishery has extended into tidal fresh water as far upstream as Philadelphia. Long-term records show a great deal of inter-annual variation in commercial landings in both Delaware and Chesapeake Bays, but there is no indication of a consistent decline in the fishery.

. . .

The larval stages of *C. sapidus* do not occur in the estuary, so they are not susceptible to entrainment by power plants or to high levels of estuarine pollutants. Juvenile and adult stages are much less sensitive to pollutants and are strong swimmers that are able to avoid especially contaminated areas. However, crabs caught in the newly developing sport fishery in the industrialized region of the upper estuary could pose a problem for human consumption because they likely contain high levels of heavy metals and lipophilic organic toxins.

Living Resources at 44, 47.

69.    The striped bass was once nearly eliminated from the Delaware by pollution but has made a substantial comeback.

The striped bass, *Monrone saxatilis*, has long been highly regarded as a sport and commercial species. The 1896 report of the State Commissioners of Fisheries to the Governor of Pennsylvania stated that the striped bass is a '…remarkable fish in every way. It ranks among the best in quality for its flesh for table use and as a game fish for the angler is esteemed by many as ranking next to salmon. This fish also has been the direct cause of the drowning of more anglers than any other member of the finny tribe.' This same report cited the capture of a 76-pound striped bass from the Delaware above Gloucester, New Jersey, as proof of their ultimate attainable size.

. . .

Within the Delaware system, striped bass are found from the mouth of Delaware Bay to as far upstream as Narrowsburg, New York, a distance of 290 river miles. Once they complete spawning in the Delaware River, adult striped bass have been shown to utilize feeding areas throughout the Delaware Estuary, the Chesapeake Bay, and along the Atlantic Coast as far as the Merrimack River, Massachusetts.

. . .

The eminent ichthyologist Dr. Edward Raney cited the Delaware
River as an '…outstanding example of the destruction of a bass
habitat by industrial and domestic pollution.'   From anecdotal
records it appears that striped bass were abundant before the onset
of the industrial revolution in the late 1800s, and that their
abundance declined drastically early this century until only a
remnant spawning population existed in the 1960s.  Through the
1960s it was common for dissolved oxygen concentrations in the
Delaware River from Philadelphia to Wilmington to reach levels of
zero to near zero from May into autumn.  The upgrading of five
major municipal sewage treatment plants in the estuary region in
the 1970s and early 1980s resulted in dramatic improvements in
minimum dissolved oxygen concentrations in the lower Delaware
River.  These water-quality improvements, coupled with protective
management by the Delaware Basin states in the 1980s, allowed
the restoration of Delaware River spawning stocks of striped bass
to proceed.  Recent indices of juvenile striped bass abundance have
been the highest recorded since annual seine net surveys were
initiated in 1980.  Another promising sign is that older age groups
(fish in excess of nine years of age) have been taken in recent
spawning ground surveys.

Living Resources at 135-136.

70.    Other important commercial and recreational fish species include bluefish, drum,

flounder, shad, and weakfish.

71.    Most of the prominent fish species of the Delaware Estuary experienced drastic

population declines at some point during the last century.

72.    A recent analysis commissioned by the Delaware Riverkeeper Network indicates:

Weakfish and white perch declined in numbers after 1997.  A
decline was also seen for spot, bay anchovy, Atlantic silverside
(1994-2001), and American shad, with the decline being
statistically significant for American shad when comparing 1991-
1994 data to 1997-2001 data.  Increases have been seen in
blueback herring, although these increases are not statistically
significant.  Striped bass data is difficult to interpret as the
abundance numbers in the Delaware are apparently linked to

29

abundance in Chesapeake Bay. Overall, it appears that striped bass has increased.

Carpenter Environmental Associates, Inc., *Evaluation Of Special Conditions Contained In Salem Nuclear Generating Station NJPDES Permit To Restore Wetlands, Install Fish Ladders, And Increase Biological Abundance Within The Delaware Estuary* (December 3, 2003).

73.    According to the Delaware River Basin Commission,

> [a]s a result of clean-up efforts in the Delaware River, shad and other fish species are increasing in number. A record number of juvenile shad were netted in the Delaware during 1996, a strong indication of exceptionally good spawning runs when these fish return to the river as adults. A recent study of Delaware River shad fishing placed a $3.2 million annual value on this fishery alone.

Delaware River Basin Commission, Delaware River and Bay Integrated List Water Quality Assessment Report (2004) at 11.

74.    The shortnose sturgeon is a federally listed endangered species found in the Delaware River and Bay. The threatened and endangered loggerhead, Kemp's Ridley, and green sea turtles also utilize the river and bay habitats.

**B.    The Hazardous and Toxic Properties of VX Nerve Gas and CVXH**

75.    VX nerve gas – O-ethyl-S-[2-(diisopropylamine)ethyl]methylphosphonothionate – is one of the deadliest substances ever produced by man.

76.    VX acts as an anticholinesterase that blocks nerve impulses by inhibiting the activity of the enzyme cholinesterase. All nerve agents, including VX, "cause their toxic effects by preventing the proper operation of the chemical that acts as the body's 'off-switch' for glands and muscles." "Fact Sheet: Facts About VX,"

Department of Health and Human Services, Centers for Disease Control and Prevention (March 7, 2003) ("CDC Fact Sheet") at 2.

77.    VX is the most toxic and deadliest nerve agent created by man, and is acutely toxic through oral, inhalation, or dermal contact routes. "Compared with the nerve agent sarin (also known as GB), VX is considered to be much more toxic by entry through the skin and somewhat more toxic by inhalation." CDC Fact Sheet at 2.

78.    "It is possible that any visible VX liquid contact, unless washed off immediately, would be lethal." CDC Fact Sheet at 2.

79.    According to the Material Safety Data Sheet for VX ("MSDS"):

> Symptoms of overexposure may occur within minutes or hours, depending on the dose. They include: miosis (constriction of pupils) and visual effects, headaches and pressure sensation, runny nose and nasal congestion, salivation, tightness in the chest, nausea, vomiting, giddiness, anxiety, difficulty in thinking, difficulty sleeping, nightmares, muscle twitching, tremors, weakness, abdominal cramps, diarrhea, involuntary urination and defecation. With severe exposure symptoms progress to convulsions and respiratory failure.

Available on-line at http://www.ilpi.com/msds/vx.html.

80.    A fatal dosage will usually result in death within 15 minutes. *Id*. "Doses which are potentially life-threatening may be only slightly larger than those producing least effects." *Id*.

81.    In the event of a fire, "[a]lthough the fire may destroy most of the agent, care must still be taken to assure the agent or contaminated liquids do not further contaminate other areas or sewers." *Id*. Contact with vapors can be fatal. *Id*. If

VX "is heated to very high temperatures, it can turn into small amounts of vapor (gas)." CDC Fact Sheet at 1.

82. People can be exposed to VX by ingesting contaminated food or water. CDC Fact Sheet at 1. VX also breaks down slowly in the body, so VX will bioaccumulate within people and other organisms. CDC Fact Sheet at 1.

83. VX evaporates as slowly as motor oil, so it is "very persistent in the environment" and "can be a long-term threat . . .." CDC Fact Sheet at 1-2.

84. Caustic neutralization of VX using sodium hyroxide would produce a liquid waste stream of material called caustic hydrolysate or CVXH. Since VX is an ester, hydrolysis can be used to break it down into its component parts. The primary products of the hydrolysis process are commonly referred to as EMPA, MPA, thiolamine and ethanol. Another product is known as EA2192. Small quantities of unreacted VX are also likely to persist through some or all phases of the treatment process.

85. EMPA (ethyl methyl phosponic acid), MPA (methyl phosphonic acid), and thiolamine (diisopropylaminoethanethiol) are classified under the Chemical Weapons Convention as Schedule 2 compounds that could recombine to form VX under suitable conditions, most notably a lower pH than the highly caustic conditions at which VXH is produced through hydrolysis.

86. EMPA and MPA are both toxic compounds, the toxicity of which are not well tested.

87. Thiolamine has a strong odor and prolonged inhalation poses a health risk, with a maximum allowable air concentration of 40 parts per billion.

88.  EA2192, while less toxic than VX, is also an anticholinesterase nerve agent like VX.

89.  Several metals including arsenic, chromium, and lead are also in CVXH.

90.  The caustic neutralization of a synthetic chemical such as VX is almost certain to have numerous other "minor" byproduct chemicals, such as various types of polymers, with potentially significant detrimental environmental impacts. Polymers are highly stable synthetic chemicals that are created by the addition of strong alkalais such as sodium hydroxide to monomeric units such as VX. These "minor" components of CVXH are not well known and studied and could have vastly toxic attributes.

**C.  The DuPont Environmental Treatment and Land Disposal Facilities in Deepwater, New Jersey**

91.  The DuPont disposal facilities in Deepwater, New Jersey consist of the DuPont Environmental Treatment facility commonly referred to as DET, which is a wastewater treatment plant (WWTP), and also a series of landfill disposal sites. These facilities are intertwined as sludge from the WWTP is disposed of in the landfills while run-off and leachate from the landfills are piped into the plant.

92.  The DuPont property is bordered by the Delaware River and the Salem Canal on the west and south respectively. The Salem Canal flows into the Delaware River, and Henby Creek and Bouttown Creek flow through the property towards the Delaware River. The property also contains at least 295 acres of wetlands.

93.  Groundwater underlying the property includes the Potomac Raritan Magothy Aquifer system and several potable water supply wells have been located within one-half mile of the facility boundary.

94.   The WWTP has a surface water discharge New Jersey Pollution Discharge Elimination System ("NJPDES") permit and the landfills have a groundwater discharge NJPDES permit.

95.   Landfill units A and B are sanitary landfills and are not lined.  Units A and B are located approximately 2500 feet to the east of the Delaware River.  Units A and B have accepted the following types of wastes:  excavation rubble, brick, cement from building demolition; clean glass; trees; asbestos; ashes from FR-2; steel pipe with Teflon lining; salvage metal; polymer products; packing; and fly ash from Atlantic Electric Company.

96.   Unit B is still in operation and receives approximately ten thousand to twenty thousand cubic yards of construction debris, asbestos, and polymer products annually.  Unit A is filled to capacity and has not accepted additional waste since February 1994.

97.   Landfill unit C is a secure landfill covering 25 acres, consisting of four areas and five proposed areas.  Area 1 has a single lining and has been out of service since 1978.  The remaining areas have primary and secondary lining with leak detection systems between the liners to monitor for seepage through the primary lining.

98.   Unit C has accepted the following wastes:  dewatered sludge filtercake from the on-site WWTP, oil-spill cleanup waste (NJ Hazardous Waste Code X725), and other toxic or hazardous wastes.

99.   The New Jersey Department of Environmental Protection ("NJDEP") has designated the groundwater beneath the DuPont disposal facilities as two classification exception areas ("CEA").   The CEA designation suspends the

designated uses of the groundwater, including the potable designation for the Class IIA Quaternary Aquifer and Potomac Raritan Magothy Aquifer underlying the DuPont property.

100.    The DuPont facility has contaminated the Upper and Middle Potomac Raritan Magothy Aquifer down to as deep as 200 feet.

101.    In the 1990s, DuPont and NJDEP entered into an Administrative Consent Order, in which DuPont committed to remediation of the hazardous waste landfill units.

102.    As part of the required remediation an interceptor well system ("IWS") is located in the center of the facility and withdraws approximately 1.5 million gallons per day to induce flow gradients towards the facility and prevent groundwater in the aquifer directly underlying the facility from leaving the site.  According to a Contaminated Site Inventory prepared for the Pennsville Township Water Department in 2005, "There is an ongoing debate if full site capture has been obtained."  The report raises the question whether a recovery well at the site boundary is being pumped at a rate sufficient to "maintain capture while not pulling contamination further down-gradient."

103.    Recovered groundwater and landfill run-off are diverted to the DET WWTP prior to discharge into the Delaware River.

104.    In addition to treated contaminated groundwater and landfill run-off, the DET WWTP is marketed as a treatment and disposal facility for waste imported from throughout the country.

**C.    History of Disposal Options Investigation and NEPA Documentation Prepared To-Date**

   **i.    Initial Consideration and Rejection of Off-Site Disposal Options.**

105.   Beginning in 1994, "the Army has made several attempts to identify viable and capable venders for off-site treatment and disposal of the hydrolysate."  Parson Corporation, Newport Chemical Agent Disposal Facility, Post Treatment Alternatives Special Study *prepared for* U.S. Army Corps of Engineers, Huntsville, Ala., and Product Manager for Alternative Technologies and Approaches, Aberdeen Proving Ground, Md. (June 2001) ("Parson 2001 Report") at 5-1.

106.   The Army considered the DuPont facility in Deepwater, New Jersey, but apparently DuPont broke off negotiations due to concerns about "negative publicity."  *Id*. at 5-1.

107.   "Faced with no other viable off-site alternatives, the Army decided to abandon the effort and focus instead on developing an on-site post-treatment technology."  *Id*. Complete on-site destruction and disposal was also favored because of "CWC treaty compliance issues and the Newport community's expressed discomfort with the concept of shipping partially treated wastes from a chemical warfare destruction facility to other sites."  *Id*.

   **ii.     Decision To Use On-Site Neutralization Through Hydrolysis And Oxidation Processes Documented In 1998 EIS.**

108.   In 1998, the Army issued a final Environmental Impact Statement on its proposal for pilot testing of caustic neutralization of VX nerve gas followed by supercritical water oxidation of the by-products on-site at the Newport Chemical Depot in Indiana.

109.    Caustic neutralization of VX using sodium hyroxide would produce a liquid waste stream of material called hydrolysate or CVXH.  Since VX is an ester, hydrolysis can be used to break it down into its component parts.  The primary products of the hydrolysis process are commonly referred to as EMPA, MPA, thiolamine and ethanol.  Another product is known as EA2192.

110.    In 1998, the Army proposed in its EIS to then use oxidation to reduce the CVXH to inorganic salts and water in an on-site supercritical water oxidation (SCWO) unit.

111.    The brine solution from the SCWO process would then be treated in an evaporator/crystallizer to remove most of the water.  The distilled water would be recycled in the neutralization process so that less than one gallon per minute would be diverted into a federally owned treatment works prior to discharge in the Wabash River.

iii.    **Analysis of SCWO and Alternative Options**

112.    In 2000, the National Research Council recommended evaluation of "off-site management of hydrolysates both for potential cost and schedule benefits and as a contingency plan in case difficulties arise during the start-up and pilot testing of the on-site (post-neutralization) process steps."   National Research Council, Integrated Design of Alternative Technologies for Bulk-Only Chemical Agent Disposal Facilities (2000).

113.    In October 2000, a Post Treatment Alternatives Study was initiated to identify and evaluate on-site and off-site alternatives.

114. The alternatives study reviewed over 100 technologies in its Tier 1 preliminary identification phase, of which 42 were deemed suitable for Tier 2 preliminary screening. Parsons 2001 Report at ES-2.

115. Nine technologies passed the Tier 2 screen: solid wall (sw) SCWO, transpiring wall (tw) SCWO, UV/peroxide oxidation (UV/$H_2O_2$), wet air oxidation (WAO), electrochemical oxidation with Ag(II) (Silver II[TM]), molten salt oxidation (MSO), gas phase chemical reduction (GPCR), plasma arc, and biodegradation. *Id.*

116. Tier 3 criteria included process efficacy, safety, and environmental impact. *Id.* at ES-3.

117. "Five (5) technologies (listed in order of preference) emerged from the Tier 3 evaluation as technically viable alternatives for on-site treatment of hydrolysate": sw-SCWO, tw-SCWO, UV/ $H_2O_2$, WAO, and Electrochemical Oxidation with Silver II[TM]. *Id.*

118. Importantly, biodegradation – a primary component of the DuPont process – did not gain acceptance as a potential on-site disposal option.

119. The five preferred technologies were characterized thusly:

> The **sw-SCWO technology received the highest ranking based on its proven effectiveness, safety, non-hazardous effluent characteristics, successful permitting history, and demonstrated ability to comply with all current NECD environmental permits**. However, problems still remain with equipment design, manufacture, and reliability, which will need to be addressed in the NECDF design. The tw-SWCO technology was ranked behind sw-SCWO because it has been proven to be as effective as sw-SCWO at destroying hydrolysate, but is a less developed and less demonstrated technology. Both UV/$H_2O_2$ and WAO are commercially available technologies with a successful permitting history for hazardous waste applications. The two technologies are less effective than SCWO, but potentially useful for pretreating the hydrolysate prior to shipment to a TSDF.

> Depending on the TSDF, pretreatment may be needed to meet acceptance criteria for odor, organic layer, and biodegradability. Silver II$^{TM}$ has been demonstrated to be almost as effective as SCWO technology at destroying the organic compounds in the hydrolysate, but it substantially less mature and more complex than any of the other alternatives.

*Id.* (emphasis added).

120.    The alternatives report also looked at off-site options, including DuPont, and concluded that there was "insufficient information at this time to justify selecting the off-site options . . . over the current plan."  *Id.* at ES-4.  In summary, the report determined:

> At this point in time, **sw-SCWO remains the preferred technology alternative for the complete destruction of VX hydrolysate at NECDF**.  Results of the recently completed EST [Engineering Scale Test] program confirmed the technology's ability to effectively and safely destroy the hydrolysate and meet environmental (RCRA, air, and water) permit performance requirements.   However, EST also revealed problems with equipment design, manufacture, and reliability, which need to be addressed in the NECDF design.

*Id.* (emphasis added).  The Parsons Report did advise that "[t]emporary on-site storage of hydrolysate may be needed to mitigate the impact of delays in post-treatment operations on the agent neutralization schedule."  *Id.* at ES-5.

121.    The Army is moving forward with a SCWO Pilot Plant at the Blue Grass Army Depot in Kentucky to destroy sarin, VX and other chemical munitions.  National Research Council, *Interim Design Assessment for the Blue Grass Chemical Agent Destruction Pilot Plant* (2005).   The National Research Council has found: "Limited testing to date of the SCWO system indicates that it can be adequate for the treatment of agent and energetics hydrolysates at BGCAPP."  *Id.* at 5.

122.  The NRC determined that a SCWO plant "that is able to safely and effectively destroy the chemical agent . . . in the chemical munitions at Blue Grass Army Depot can be anticipated." *Id*. at 4.

123.  Regarding the on-site treatment and disposal of VX byproducts at the Blue Grass, Kentucky facility using SCWO, NRC states:

> The permitting process has been approved by the Kentucky Department of Environmental Protection (KDEP).  Permits have been obtained on a timely basis, and KDEP, with the Army and its contractors, has established a well-defined sequence for interactively managing the modifications of permits for BGCAPP through the completion of its design, operation, and closure.  In addition, the Army and its contractors have worked closely with the Kentucky Citizen's Advisory Commission (CAC) and a public focus group established by the CAC, the Chemical Destruction Community Advisory Board (CDCAB).  The CDCAB meets frequently with the Army and its contractors to review design progress and to advise the public on policy issues of progress and to advise the public on policy issues of interest.  The committee encourages the Army and its contractors to continue to pursue public involvement.

*Id*. at 4.

### iv.    2002 Generic EA Covering Off-Site Treatment Without Analyzing Any Specific Treatment Plants Or Discharge Locations, Or Considering Alternatives.

124.  In July 2002, the Army released a document entitled "Final Environmental Assessment: Accelerated Neutralization of Chemical Agent and Off-Site Shipment of Liquid Process Effluents at the Newport Chemical Agent Disposal Facility" ("Supplemental EA").

125.  The Supplemental EA indicates that in the wake of the September 11, 2001 terrorist attacks, the Army determined that accelerating destruction of VX stockpiles is necessary to "more quickly remov[e] the risks of continued storage

of VX (e.g., risks of VX releases caused by accidents, natural disasters, and acts of terrorism)." Supp. EA at 1-3.

126. The Supplemental EA analyzes and considers only two alternatives: the "no action" alternative and the proposed action of accelerated destruction of VX and generic off-site disposal. No specific off-site disposal locations or methods are identified or analyzed.

127. "The two key differences between the no-action and the accelerated neutralization alternatives are: (1) accelerated destruction would be achieved by using a manually operated Chemical Agent Transfer System (CHATS) instead of the robotically operated Ton Container Cleanout (TCC) line to open the [storage containers] and drain the VX; and (2) hydrolysate resulting from accelerated neutralization would be shipped off-site for disposal." Supp. EA at 2-1.

128. The proposed action, in addition to accelerating the destruction of VX nerve gas, eliminates the on-site oxidation, or SCWO process, and ships hazardous VXH to an at that time undetermined off-site facility for disposal and possibly further treatment.

129. The EA notes and then summarily eliminates based on cost concerns a potential third option of accelerated neutralization VX nerve agent and construction of on-site storage for hydrolysate waste pending on-site SCWO or other treatment facility development. The EA does not provide any indication of the costs of a hydrolysate storage facility in relation to the overall costs of neutralization and disposal or in comparison to off-site transport and disposal.

130.    The Supplemental EA almost exclusively addresses issues related to transportation of VXH and potential impacts "in the vicinity of NECD" in Indiana.  Supp. EA at 1-3.  The Army "recognize[s] that some impacts that would be avoided or reduced at NECD could be transferred to" the locality of the yet to be selected disposal facility.  *Id*. at 1-3 – 1-4.  However, the Army makes explicit that "[i]ndividual [treatment, storage, and disposal facility ("TSDF")] evaluation or a TSDF technology evaluation is beyond the scope of this EA."  *Id*. at 1-2.

131.    The Army describes the potential off-site treatment and disposal of the hazardous CVXH in the following generic and hypothetical terms:

- caustic hydrolysate **may** be transferred into a secondary treatment unit

- Secondary treatment **may** be needed to meet the acceptance criteria of a receiving TSDF

- This treatment unit, **if used**, would **probably** include an oxidation process

- **most likely** treatment is with hydrogen peroxide

Supp. EA at 2-7 (emphasis added).

132.    Based on such generic and hypothetical descriptions of the off-site treatment process and without identifying any specific disposal site locations (or even regions), the Army indicated that it "will consider comments received during the public comment period on the [2002] EA with respect to the TSDF technology or an individual TSDF in any subsequent TSDF contractor selection process."  Supp. EA at 1-2.

133.    The EA was "made public in the community surrounding the Newport Chemical Depot in Newport, Indiana, and in communities surrounding potential TSDFs." Supp. EA at 1-2.    However, publication of the EA and draft finding of no significant impact was announced only "in newspapers near the Newport Chemical Depot," *id*. at 5-2, and "[t]he repositories [to view the EA] for the communities near [the considered] TSDF's [were not] listed in this EA – to insure that the competitive bid process is not compromised."    *Id*. at 5-3.    The Army explains that "[l]isting of these repositories would allow 'candidate' TSDFs to identify competitors that also received the proposal (RFP), and perhaps interfere with the intended fair and open procurement process."    *Id*.

134.    The environmental impacts listed in the EA – which potential CVXH waste receiving communities in various unidentified parts of the country could comment on – included:

- an "Environmental Setting" described as the NECD laying "about 2.5 miles southwest of Newport, Indiana" and "cover[ing] about 7,100 acres of relatively flat land,"  Supp. EA at 3-2;

- air quality impacts to "Vermillion County, Indiana, which is in attainment of all state and National Ambient Air Quality Standards," *id* at 3-4;

- water resources of the Wabash River, Little Vermillion River, and the glaciofluvial aquifer in the vicinity of Newport, Indiana," *id*, at 3-6 – 3-7;

43

- the federally listed as endangered Indiana bat and "[f]ive Indiana-listed endangered bird species – the upland sandpiper, osprey, sandhill crane, sedge wren, and Henslow's sparrow," *id*. at 3-11; and

- road conditions and traffic counts on Indiana State Route 63, *id*. at 3-15.

135.    The EA contains cursory description of the general risk of traffic accidents in the transport of VXH, stating simply that "[b]ecause of caustic and toxic properties of hydrolysate, an accidental spill during transportation could cause disruption and possibly require evacuation." *Id*. at 3-20.  The EA does not discuss or analyze the risks of intentional attack or hijacking of VXH shipments, including the intentional and malicious addition of large quantities of acid to allow the reconstitution of VX.

**E.    Other Potential On-Site and Off-Site Disposal Locations and Methods Not Analyzed As Alternatives Through the NEPA Process.**

    **i.    Dayton, Ohio**

136.    An earlier plan under consideration by the Army involved the shipment of CVXH to a private facility, PermaFix, in Dayton, Ohio, where the VXH would be treated in a multi-step process before being discharged into the sanitary sewer system of Montgomery County, Ohio.  A small-scale test of the system was conducted.

137.    The Montgomery County Commissioners hired an independent expert to review this proposal and the result of the test.  The report prepared by Dr. Bruce E. Rittman, John Evans Professor of Environmental Engineering, Department of Civil and Environmental Engineering, Northwestern University, describes the proposed multi-step process for treating VXH at the PermaFix facility.

138.    According to Dr. Rittman, and plaintiffs hereby allege, the PermaFix proposal

consisted of the following steps and results:

> The first step will be oxidation with a strong industrial oxidant at a
> somewhat elevated temperature (c. 55°C, or 131°F).  The primary
> goal of the first step is to remove thiolamine by converting it to a
> disulfide.  Removing thiolamine will eliminate the most odorous
> compound and one of the components needed to reform VX.  With
> thiolamine removed, the pH can be reduced safely.  Reducing the
> pH reduces problems of causticity and flammability
> . . .
> The second step will be another oxidation process using a catalyst
> to accelerate the reactions brought about by the oxidant . . . The
> goal of the second oxidation is to remove EMPA and MPA.
> Destruction of EMPA and MPA will release a significant amount
> of phosphate, much of which will precipitate with metal cations
> (mainly $Fe^{3+}$) in the mixture to form inorganic solids.  Ammonia
> ($NH_3$) also should be released.
>
> The third step will be filtration of the oxidation effluent to remove
> the solids, most of which should be inorganic phosphates, such as
> $FePO_4(s)$.  The solids are to be disposed of in a Sub-Title D Non
> Hazardous Landfill.  It is likely that some organic compounds
> including MPA and EMPA, will accumulate in the solids.  This is
> significant, because MPA and EMPA could leach from the solids
> while in the landfill, posing a potential environmental risk if the
> leachate were to escape the landfill.
> . . .
> The mixed wastewater will then be treated in . . . existing
> biological-treatment reactors.  At least some of the organic
> products formed during the oxidation steps are biodegradable: e.g.,
> ethanol.  The biodegradability of MPA and EMPA, on the other
> had, is not yet well defined, although Munro et al. (1999) report
> that EMPA is biodegradable.
> . . .
> Off gases will be generated during all steps of treatment and
> transfer.  All of the off-gas streams have potential to be odorous,
> and the original VXH is highly odorous due to thiolamine.

139.    Dr. Rittman summarized that the facility:

> proposes multi-step treatment to convert VXH into a liquid
> effluent that can be discharged safely to the sanitary sewer.  On the
> one hand, each step of the multi-step process is based on a sound
> scientific foundation.  Thus, I find no scientific reason to judge *a*

*priori* that the proposed plan cannot work.  On the other hand, the multi-step treatment scheme is new and unique.  It has only been tested at the bench scale . . . and it has never been tested under realistic operating conditions.  This situation means that the start up of VXH treatment at [the PermaFix facility] will be the first test with realistic operating conditions.  Thus, the start up should be phased in and very closely monitored.

140.    The Army abandoned the Dayton, Ohio facility option in response to local public opposition without analyzing or describing this alternative in any NEPA document.

ii.    **Unexamined Off-Site and On-Site Indiana Disposal Alternatives**

141.    Wabash Environmental Technologies (WET), located in Terre Haute, Indiana, 25 miles from the Newport Chemical Deport, expressed an interest in handling the VX hydrolysate in 2003.

142.    WET President, Derrik Hagerman, indicated that his facility could safely treat the VXH and at least one local Indiana State Representative supported the proposal.

143.    Also, the Parsons 2001 Report noted that "Heritage Environmental Services operates a large, commercial, RCRA-permitted wastewater treatment plant in Indianapolis, Indiana", which discharges to the publicly owned treatment works. Parsons 2001 Report at 5-4.  The Report further stated, "It might be advantageous to select a facility [like Heritage Environmental Services] that discharges its treated effluent to a publicly owned treatment works (POTW) when considering other candidate commercial wastewater treatment facilities, because the effluent will undergo further treatment." *Id*.

144.    An additional alternative for on-site disposal at the Newport, Indiana Army facility is the use of ARCTECH's commercial HUMASORB® technology.  This

technology successfully treated over 180,000 gallons of "caustic wastewater containing toxic metals and phosphorus chemicals from the Army's Chemical Weapons Demilitarization Operations at Johnston Island in the Pacific . . .." ARCTECH, *Comments on the Draft Revised Finding of No Significant Impact* (April 19, 2004) at 1.

145.    According to ARCTECH its technology could be deployed on-site at the Army facility in Newport, Indiana and that under an Army contract it has "proved the feasibility of its technology for safe and effective treatment of hydrolysate from both nerve (VX and GB) and blister agents (H)." *Id*.

146.    "VX Thiol, EMPA, and MPA contaminants of concern in the VX hydrolysate in Newport, Indiana were completely destroyed and an independent technical panel of the National Research Council validated this conclusion in their 2001 report to the Army." *Id*.

147.    According to ARCTECH, its technology removed phosphorus and twenty toxic metals, including arsenic, mercury, and lead to EPA standards.

148.    On-site use of the ARCTECH technology at Newport, Indiana would also allow treated wastewater to be sent to the Depot's Federally Owned Treatment Works for further treatment prior to discharge, *id*. at 2, as the Parson Report identified as advantageous, *see supra* at ¶¶ 143.

149.    In August 2003, the Army Chemical Materials Agency documented for the record the successful application of ARCTECH's HUMASORB® technology at Johnston Atoll. Department of the Army, US Army Chemical Materials Agency (Provisional) Johnston Atoll Chemical Agent Disposal System, *Memorandum for*

*Record: ARCTECH's HUMASORB® technology – Successful Application at Johnston Atoll Chemical Agent Disposal System* (August 19, 2003) at 1.

150.    The Army noted the successful design, construction and installation of the system, as well as the subsequent successful treatment of up to 180,000 gallons of brine in two years with modifications necessary to treat brines of varying characteristics. *Id.*

151.    According to the Army, the technology has the following advantages: 1) reducing metal concentrations to below permit limits; 2) faster processing of the brine; and 3) resulting solid waste is non-hazardous.

152.    Local treatment and disposal alternatives in Indiana, the State in which the VX is currently stored, have never been analyzed or considered in any NEPA document despite the fact that Federal law requires complete destruction of biological and chemical weapons stores within the State in which they are currently located.

F.    **The Army's Proposal to Ship VXH to DuPont in Deepwater, New Jersey and the Public Opposition Due to Unexamined Environmental Impacts, As Well As a Lack of Meaningful Opportunity for Public Input.**

    i.    **The proposed treatment methods at the DuPont facility**

153.    "DuPont has proposed the use of a persulfate oxidation process to remove thiolamine and [EMPA] from the hydrolysate prior to biotreatment."  Science Applications International Corporation, "Effect of the DuPont Persulfate Treatment Process on Trace Quantities of VX and EA2192 in Hydrolysate" (August 2005) ("SAIC Study") at 1.

154.    First the pH of the hydrolysate is adjusted to a pH of 4 – 6 and then peroxide is added to control odors and initiate thiolamine destruction.  CDC 2005 Report at Attachment 4, p.22.

155.    The next treatment step is biodegradation using a two-stage powder activated carbon treatment system ("PACT").

156.    According to a CDC Report:

> The Technical Assessment and Basic Data Summary reports clearly document the conversion of EMPA and MPA.  Both compounds remain unaffected by the pH reduction, and conversion during peroxide treatment appears to be limited.  Biological treatment by the two-stage PACT process converts essentially all of the EMPA to MPA but appears not to affect the MPA decomposition.  .  .  .  The slight decrease in MPA effluent concentration most likely results from partitioning in the organic sludge.
> DuPont's Technical Assessment and Basic Data Summary reports contain no information about the fate of VX or EA 2192 during treatment of the CVXH in the DuPont SET facility.  The presence of these two compounds in the plant effluent in trace amounts cannot be excluded.

157.    According to the SAIC Study, the persulfate procedure during a small-scale test removed VX and EA2192 "fortified" samples of hydrolysate from "concentrations that ranged from 124 to 195 [parts per billion] ppb" to "non-detect" levels.  SAIC Study at 18.  Generally, "non-detect" has been based on a method detection level of 20 ppb for VX and 1 ppm for EA 2192.  According to DuPont, current method detection levels are 15 ppb for VX and 200 ppb for EA-2192.

158.    Lastly, settlable solids will be removed, dewatered and buried, along with the carbon filters, in the hazardous water landfill.  The remaining effluent, along with the other plant waste streams, will be discharged into the Delaware River.

ii.      **The CDC's Report to Congress of April 2005**

159.    In April 2005, CDC issued its report on the DuPont facility disposal option and

summarized its four primary findings as follows:

- CDC found that the potential human health hazards of the untreated CVXH are associated predominantly with its corrosive and caustic properties and not nerve agent effects, although **trace levels of VX and EA 2192 (a degradation product with nerve agent properties) may be present**. The toxicity of CVXH **does not preclude** handling and transportation provided that proper precautions are in place.

- The transportation plan meets Department of Transportation regulations, and precautions in the plan are adequate to protect the public, personnel, and environment.

- CDC's technical review of the DuPont SET indicated it is a viable process and **should be capable** of treating the major components of CVXH . . . However, the NECDF VX stockpile utilizes two chemicals (referred to as stabilizers), diisopropylcarbodiimide (DIC) and dicyclohexylcarbodiimide (DCC), added to prevent VX degradation during storage. The data indicate that CVXH produced from DIC-stabilized VX at the 8% agent loading level should meet the Army's clearance criteria for VX and EA 2192 during storage and can be treated at DuPont. . . . **Loadings greater than 8% of DIC-stabilized VX or any treatment of VX stabilized with DCC is not recommended** until the treatment effectiveness is demonstrated and confirmed. **Consequently, only a portion of the Newport VX stockpile currently can be processed to meet clearance criteria.**

- The Environmental Protection Agency's (EPA's) analysis indicates that **the DuPont risk assessment does not contain adequate information to determine that the aquatic ecologic risk from the discharge of treated CVXH to the Delaware River is acceptable**. Further, the EPA expressed concerns that the 20 ppb clearance criterion for VX in CVXH is based 'solely on the protections of humans from a drinking water source and **may not be protective of aquatic organisms through ingestion or dermal exposure**.'

160. Regarding transportation risks, the CDC found that the "risk from an accidental spill appears to be comparable to that expected for any highly corrosive material with high pH." CDC 2005 Report at 10. The CDC does not appear to have considered the risk of intentional, malicious action during the transport of CVXH. The CDC does not appear to have done a comparative risk analysis of the specific risks of transport to the Deepwater, NJ facility approximately 750 miles from Newport, Indiana as compared to the risks of transport to closer off-site facilities or on-site storage.

161. The CDC study acknowledged that at least one "potential cross-contamination link (a three-way valve that controls flow of both hydrolysate and [nerve] agent) . . . could result in agent VX reaching the CVXH holding tank after batch reactor sampling." CDC 2005 Report at Attachment 3, p.4. CDC asserts a 1 per 20,000 risk of unprocessed VX being shipped and deems that an insignificant risk for transportation purposes because of the high odds that cross-contamination and a transportation accident will coincide on the same shipment. CDC does not consider the risk of cross-contamination either in the context of deliberate sabotage at the treatment facility or in the case of hijacking of a shipment.

162. According to CDC, "[a] maximum credible event could involve a 5000-gallon tank truck or tote in an in-transit accident that ruptures the containment." *Id*. at Attachment 3, p.4. CDC – and the prior studies CDC based its conclusions on – does not appear to consider the consequences of an accident involving an explosion or fire, caused either by accidental or intentional means.

163.    CDC found the "individual DuPont and U.S. Army toxicity studies [to be] limited in scope and applicability," but concluded that the studies "**do not preclude** the handling and transportation of untreated CVXH if appropriate engineering and administrative controls and personal protective equipment are used." *Id.* (emphasis added).

164.    CDC also concludes that the toxicity studies on CVXH are "limited in scope" yet discounted the highly toxic results of one study – out of only eight studies analyzed – as "not representative of the toxicity of CVXH." CDC 2005 Report at Attachment 2 p.4. According to CDC, another study "did not use controls needed to determine whether the effects were due strictly to the by-product salts and not to residual VX or EA 2192." *Id.* Regarding another study CDC states that "[b]ecause no sham or age-matched control animals were used in this study, it is not possible to draw definitive conclusions about these effects." *Id.* According to CDC two other "studies presented no information to assess the nature of the acute toxicity – that is . . . generated no information about the type of toxic effects (i.e. organ system affected)." *Id.* at Attachment 2 p.3. CDC dismissed two other studies because "the computational toxicology analyses of MPA and EMPA did not provide useful predictions of the acute toxicity of these chemicals." *Id.* at Attachment 2 p.5. CDC further explained that "positive predictions of toxicity for development effects for both MPA and EMPA . . .[,] bacterial mutagenicity for EMPA . . . and the negative prediction for skin sensitization . . . are not reliable because the query structures are poorly represented in the . . . models' datasets." *Id.* Finally, the last paper analyzed by CDC only sought to "calculate a

Performance Indicator (PI) value for EA 2192" to design the "performance goals of the Newport Pilot Plant." *Id*. Regarding this study, CDC concluded that "[t]he PI methodology appears appropriate; however, the EPA PRG User's Guide/Technical Background Document states, 'For many chemicals, a scientifically defensible data base does not exist for making an adjustment to the oral slope factor/RfD to estimate a dermal toxicity value." *Id*. CDC summarized that the "supporting studies do not provide adequate data on the nature of the toxicity of [EMPA] and [MPA]." *Id*. at Attachment 2, p.1.

165.    Based on these limited, flawed and/or inconclusive studies, CDC concluded that "MPA and EMPA components do not introduce **excessive** risk in handling and transportation," and that "the studies considered in their totality **do not preclude** the handling and transportation of CVXH, assuming appropriate engineering, administrative, and personal protection policies are in place." *Id*. at Attachment 2, p.6 (emphasis added).

166.    Regarding the other primary CVXH constituent, thiolamine, CDC indicates that information is "limited."  *Id*. at Attachment 2, p.6.  However, CDC notes that "Mercaptans in general are well-known noxious volatile odorants and skin irritants." *Id*.

167.    Overall, "CVXH is highly corrosive."  *Id*. at Attachment 2, p.6.  "The major human exposure pathway is dermal contact, which will result in severe, possibly irreversible damage.  Eye injury is also possible, and inhalation of aerosolized CVXH potentially could damage the respiratory tract." *Id*.

168.   The CDC report contains the qualified determination that "[s]cale-up of the [treatment and disposal] process from laboratory/bench-scale to pilot-scale **should be feasible**." CDC 2005 Report at 11. "However, because NECDF will be a pilot facility, process changes must be anticipated, along with resultant variations in hydrolysate composition sent for off-site treatment." *Id.*

169.   While the transportation risk analyses incorporate the risk of the possibility (estimated at 1 per 20,000) of cross-contamination of a CVXH shipment with untreated VX, *see supra at* Paragraph 161, the implications of cross-contamination for treatment and discharge toxicity do not appear to have been considered.

170.   CDC does not purport to make any finding as to whether transportation, treatment and disposal of CVXH using the DuPont facility in Deepwater, New Jersey may have any significant effects on the human and natural environment for purposes of NEPA.

171.   CDC does not purport to identify the disposal method that presents the overall lowest risk to human health and safety, or to undertake any comparative risk analysis of the potential alternative disposal methods and locations.

iv.     **EPA's objections in October 2004**

172.   Because questions relating to ecological effects of the proposed action were beyond the expertise of the CDC, it asked EPA the following question: "From an ecological standpoint, is the disposal of material as presented in the DuPont Chambers ecological risk assessment acceptable?" CDC 2005 Report at Attachment 5, p.1.

173. "Based on [EPA's] review of the information provided and the amount of outstanding issues that need to be addressed, EPA's position is that DuPont has not demonstrated that the disposal of material as presented in the ecological risk assessment is acceptable." *Id*.

174. EPA summarized its concerns as follows:

> [T]he Screening Level Ecological Risk Assessment (SLERA) does not contain adequate information to conclude that there is no unacceptable risk from the discharge of treated VX hydrolysate to the Delaware River, and a number of constituents were left out of the analysis completely. In addition, there are several additional issues that need to be addressed before treatment and discharge of this treated hydrolysate to the Delaware River can occur including: whole effluent toxicity tests procedures, the potential for the presence of VX nerve agent and other toxic breakdown products in the hydrolysate, the addition of phosphorous to the estuary, and the NPDES permit with New Jersey.

> *Id*. at Attachment 5, p.1.

175. According to EPA, and hereby alleged by Plaintiffs, the ecological risk assessment conducted by DuPont is deficient for the following specific reasons:

- "The SLERA does not include and evaluate all detected constituents found in the VX hydrolysate. DuPont focused the assessment only on the 'principal constituents' of [EMPA] and [MPA] . . . [however] several metals including arsenic, chromium, and lead were found in low ppm concentrations in the hydrolysate. . . . EA2192 . . . another breakdown product of VX nerve agent, is not included in the SLERA."
- "The use of more conservative assumptions in the SLERA as [suggested by EPA] will certainly increase the risk quotients and risk indices. These increases will ultimately produce higher risk quotients that may approach or exceed [a level] indicating a potential for adverse ecological effects and that a more thorough risk assessment is warranted."
- "[The 20 ppb] detection limit is based solely on the protection of humans from a drinking water source and may not be protective of aquatic organisms through ingestion or dermal exposure."

- "Acute exposure studies of the VX nerve agent have been performed demonstrating that 7 out of 10 juvenile striped bass were killed after 14 to 20 hours of exposure to 20 ppb (method detection limit) of VX nerve agent. All of the white perch (10 of 10) exposed to 25 ppb (slightly above the detection limit) of VX nerve agent in aqueous medium died in approximately 9 hours (Weimer, et. al., 1970). This report stated that 'the effects of chronic exposures to lower levels of VX have not been studied.' These chronic exposure studies, using aquatic species included in the NPDES permit, should be performed prior to discharge of the hydrolysate effluent to the river. Discharge of even small amounts of VX nerve agent remaining in the hydrolysate effluent to the Delaware River could have potentially adverse effects on aquatic organisms since this effluent is planned to be discharged about two times per day for approximately two years."

- "EA2192 is another toxic breakdown product generated during the destruction of VX nerve agent. According to a November 2001 US Army Center for Health Promotion and Preventive Medicine report, 'based on its persistence and toxicity it has been suggested in several reports that EA2192 be viewed as a serious consideration wherever VX is being destroyed.' The report also states that EA2192 may 'pose a greater potential for chronic toxicity' than VX and once in solution, it is extremely persistent in the environment."

- "[T]he tributaries of the Delaware River near the outfall of the SET already have poor grades for water quality, dissolved inorganic phosphorus (DIP), and benthic index. Although the current conditions in the Delaware Estuary do not demonstrate that eutrophication is occurring, it is unclear [what will be] the effect of the addition of MPA and other phosphorus-containing compounds from the discharge of the VX hydrolysate effluent into the Delaware River. The concern is that the addition of these compounds could increase the amounts of DIP in the estuary to such a point that the system would create unwanted algal blooms. Given the fact that the proposed discharge is located in Zone 5 of the Delaware River, which is characterized as the transition zone, an increase in the concentration of [phosphorus] to the system may result in phytoplankton biomass production [and eutrophication]."

*Id*. at Attachment 5, pp.3-6.

176. EPA found that the "conclusions of the SLERA are not valid and that the ecological risk process on the Army's proposal to discharge treated VX hydrolysate to the Delaware River must continue." *Id*. at Attachment 5, p.2.

177. While the Army and DuPont have done some additional work since the EPA's objections in 2004 to justify the Army's decision to utilize the DuPont facility and EPA has withdrawn its objections, the Army has proceeded entirely outside the procedures and requirements of NEPA in doing so.

   **v.    CDC 2006 Report**

178. In 2006, CDC issued a second report on a revised plan for treatment and disposal of CVXH at the DuPont facility in which CDC found that:

   - [A] revised process would be "effective in substantially reducing phosphonates in the effluent [and have] the ability to effectively destroy any trace amounts of VX, if present, to below the detectible limits of the analytical equipment."

   - "Clearance and treatability were . . . demonstrated successfully for . . . each feed/stabilizer variation . . . as well as for a 16% laboratory generated material for all stabilizer variations."

   - "EPA found that all of the previous ecological concerns have now been satisfactorily addressed by DuPont and/or the Army," according to CDC.

   CDC 2006 Report at 1 – 2.

179. While CDC indicates that all of EPA's concerns have been satisfactorily addressed, CDC does note that "EPA recommends that bioassessment studies be

conducted in-stream by DuPont to establish baseline in-stream benthic macroinvertebrate and fish community structure in the vicinity, including downstream of the DuPont discharge, before CVXH processing begins." CDC 2006 Report at 3.

180. CDC explicitly notes, "EPA was not asked to evaluate other possible alternatives for VX destruction and disposal," i*d*. at 19, and nowhere in the CDC report is there any quantification of how much phosphorus will be discharged to the Delaware River beyond noting that the phosphorus load will be substantially reduced.

181. Additionally, CDC indicated that the Army "should continue to collect performance data on representative sampling, and provide them to CDC for review, to maintain statistical confidence that representative hydrolysate samples are being collected consistently over time and from varying hydrolysate batches." *Id*. at 3. "If key CVXH characteristics such as flammability, pH, or an increase in solids content change, CDC recommends that the regulators involved have the toxicology and transportation reevaluated to ensure public health and safety will not be compromised." *Id*.

182. The second CDC Report highlighted a number of new and existing concerns.

183. "For example, it was found that CVXH initially produced at NECDF's full-scale pilot plant exhibited the unexpected characteristic of flammability, which was not present in the laboratory bench-scale produced hydrolysate." *Id*. at 9.

184.  While the Army committed to raising the flashpoint of any shipments to greater than 140°F, *id*. at 10, this discovery did not appear to result in any analysis of the risk of an accidental or intentional explosion or fire during transport.

185.  "The potential differences in characteristics between the laboratory-scale testing and the production facility's product and in how the facility addressed these issues led to a review of how both NECDF and DuPont will respond to any future changes and ensure these changes do not adversely affect health and safety." *Id*. at 10.

186.  CDC's consultant for the second report also discovered that VX concentrations in solid phases of CVXH contained up to 1 part per million of VX (compared to a clearance level of below 1 part per **billion**). *Id*. at 10. The CDC notes that because of the differing levels of VX in the different phases of CVXH (organic, suspended solids and aqueous) "[t]o obtain a sample that accurately reflects or represents the contents of the reactor, the sample must be taken from a well-mixed flow of material that is not allowed to separate." *Id*. at 10.

187.  "During the start-up of the facility, several incidents occurred during which tanks were contaminated when manual tank valves were incorrectly operated or automatic valves failed to function correctly. These incidents were detected, the material isolated, and corrective actions planned to prevent reoccurrence. . . . [N]o means currently exist for NECDF to resample [the storage tanks] to determine the impact of the contamination. NECDF plans to return any such material to the reactors for reprocessing as needed." *Id*. at 11.

188.    The CDC Report does not explain how the Army and CDC can be confident that the incidents of contamination that occurred were only those incidents that the Army detected.  In the absence of even the ability to test storage tanks to monitor for contamination, it is impossible for the Army and CDC to claim conclusively that detected incidents of contamination were the only such incidents.

189.    "On the basis of good technical and operating practice, NECDF should have an additional method to allow representative sampling from storage tanks and shipping containers if there is concern that the sampler had not functioned correctly or to verify the CVXH characteristics have not changed due to long-term storage or possible contamination.  Currently, if the material needs to be rechecked or verified, the only way to obtain a sample is to return the material to the reactor.  Such action is a long and complex process that reduces the facility's available production capacity.  Although NECDF has increased the operational reliability of the sampler, no downstream backup or verification is in place.  CDC recommends that NECDF develop a plan to address this deficiency and operation of the system." *Id*. at 11-12.

190.    In addition to the above noted incidents of contamination of the waste, the materials selected at first for "construction of the reactor valves and gaskets initially resulted in a spill of CVXH in the contained area of the Toxic Cubicle." *Id*. at 33.

191.    In regards to the toxicity of other components of the CVXH besides the primary constituents that EPA and others raised as concerns, "CDC was unable to locate substantial studies or data to address these questions." *Id*. at 15.

192.    CDC also could not eliminate the possibility that VX nerve agent would enter public water intakes nine miles from the discharge point.

193.    "To reach this intake with surviving VX would take a combination of events thought to be unlikely. The Newport clearance procedures would have to fail in some manner, and such failure would have to be missed by DuPont in their review of the waste characterization before shipment. Also these mutual failures would have to occur during a drought condition." *Id*. at 27.

194.    CDC does not appear to have considered whether prohibitions on the discharge of CVXH during drought conditions would be a prudent risk minimization measure considering the potential risk to public water supplies is higher during drought conditions and CDC has recognized that storage tank contamination cannot be monitored after sampling clearance.

195.    CDC acknowledges that numerous risk issues "have been and will continue to be identified as the plant moves toward full-scale processing." *Id*. at 31.

196.    "Examples of technical issues identified to date include a) the need to better match materials of construction used for valves and other components handling VX and CVXH, b) the need to eliminate the potential flammability characteristic from CVXH and still meet clearance criteria, and c) the need to improve sampling to provide a reliable and repeatable representative sample for shipping analysis." *Id*. at 31.

197.    At bottom, the second CDC report describes a process that already has resulted in a number of accidents and incidents of contaminations, unexpected waste

characteristics during scale-up from bench-scale to full-scale operations, continued information gaps, and remaining concerns.

### iii.    Public and local elected official opposition to DuPont disposal option

198.    The Governors, Senators and Representatives, and state environmental protection agency officials of both New Jersey and Delaware have expressed their concerns regarding and opposition to the discharge of the VX waste by-products into the Delaware River and Estuary.

199.    On January 14, 2004, Senators Corzine and Lautenberg and Representatives Andrews and Lobiondo of New Jersey wrote the Army to express their dissatisfaction regarding the inadequate opportunities for public comment and involvement provided by the Army to that date.

200.    Pike County and the Boroughs of Morrisville and Langhorne, Pennsylvania have passed resolutions opposing the use of the DuPont facility for VX waste treatment and disposal, as have the following New Jersey local and county governments: Burlington City, Borough of Riverton, East Windsor Township, City of Cape May, Cape May County Board of Chosen Freeholders, Great Egg Harbor National Scenic and Recreational River, Upper Pittsgrove Township, Pittsgrove Township, Downe Township, Woodstown, Salem County, Borough of Avalon, and Cumberland County Board of Chosen Freeholders.

201.    Well over a thousand citizens have written to express their opposition.

### G.    Concluding Allegation

202.    On information and belief, Plaintiffs allege that Defendants have eliminated from consideration all options for the treatment and disposal of the caustic VX

hydrolysate currently in Newport, Indiana other than utilizing the DuPont facility in Deepwater, New Jersey and further Defendants have made a final agency determination to use the DuPont facility to treat and dispose of the caustic VX hydrolysate.

## CLAIMS FOR RELIEF

### CLAIM I – Chemical Weapons Statutes

203.   Paragraphs one through 202 are hereby incorporated by reference.

204.   In deciding to transport partially treated VX across State lines and to utilize a facility not constructed for the sole purpose of destroying biological and chemical munitions to finalize destruction of the partially treated VX, Defendants have acted in a manner that is arbitrary and capricious and otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) and statutes governing the handling and destruction of the Nation's chemical weapons stores, 15 U.S.C. §§ 1512-1521.

### CLAIM II – NEPA (Failure to take a "hard look" at local site-specific impacts)

205.   Paragraphs one through 202 are hereby incorporated by reference.

206.   In failing to take a hard look at the site specific environmental impacts of treatment and disposal of VX hydrolysate at the DuPont facility in Deepwater, New Jersey in any environmental impact statement or environmental assessment, the Defendants have acted in a manner that is arbitrary and capricious and otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) and the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.

**CLAIM III – NEPA (Failure to consider alternatives)**

207.    Paragraphs one through 202 are hereby incorporated by reference.

208.    In failing to consider a full range of reasonable alternatives to the treatment and
disposal of VX hydrolysate at the DuPont facility in Deepwater, New Jersey in
any environmental impact statement or environmental assessment, the Defendants
have acted in a manner that is arbitrary and capricious and otherwise not in
accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. §
706(2) and the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.

**CLAIM IV – NEPA (Failure to consider potential for non-accidental transport risks)**

209.    Paragraphs one through 202 are hereby incorporated by reference.

210.    In failing to consider potential non-accidental risks in the transport of VX
hydrolysate from Newport, Indiana to the DuPont facility in Deepwater, New
Jersey in any environmental impact statement or environmental assessment, the
Defendants have acted in a manner that is arbitrary and capricious and otherwise
not in accordance with law in violation of the Administrative Procedure Act, 5
U.S.C. § 706(2) and the National Environmental Policy Act, 42 U.S.C. §§ 4321 et
seq.

**CLAIM V – NEPA (Failure to consider potential violations of federal law and
international treaties)**

211.    Paragraphs one through 202 are hereby incorporated by reference.

212.    In failing to consider the potential for violation of Federal law and International
Treaties through the interstate shipment of partially treated chemical weapons
munitions, the Defendants have acted in a manner that is arbitrary and capricious

and otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) and the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.

**CLAIM VI – NEPA (Failure to consider socio-economic impact of actual and perceived pollution threats to vital commercial and recreational fisheries)**

213.    Paragraphs one through 202 are hereby incorporated by reference.

214.    In failing to consider the socio-economic impact of actual and perceived pollution threats on the eastern oyster, blue crab, striped bass and other commercial and recreational fisheries from the potential discharge of VX, CVXH constituents, heavy metals, phosphorus and other pollutants to the Delaware River and Estuary from the DuPont facility in Deepwater, New Jersey in any environmental impact statement or environmental assessment, the Defendants have acted in a manner that is arbitrary and capricious and otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) and the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.

**CLAIM VII – NEPA (Improper finding of no significant impact)**

215.    Paragraphs one through 202 are hereby incorporated by reference.

216.    Defendants' finding that the treatment and disposal of VX hydrolysate at the DuPont facility in Deepwater, New Jersey, including transportation of the hazardous material from Newport, Indiana to the facility, in conjunction with past, present and reasonably foreseeable sources of degradation of the Delaware River and Estuary, will not have significant environmental impacts is arbitrary, capricious, and otherwise not in accordance with law in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2) and the National Environmental

Policy Act, 42 U.S.C. §§ 4321 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

1. For a declaratory judgment that Defendants' decision that the proposed treatment and disposal of VX hydrolysate at the DuPont facility in Deepwater, New Jersey, including transportation of the hazardous material from Newport, Indiana to the facility, in conjunction with past, present and reasonably foreseeable sources of degradation of the Delaware River and Estuary, will not have significant environmental impacts is arbitrary, capricious, and otherwise not in accordance with law in violation of the Administrative Procedure Act, the National Environmental Policy Act and statutes governing the handling and destruction of the Nation's biological and chemical weapons stores;

2. For a declaratory judgment that the environmental analyses prepared by the Defendants do not adequately describe, analyze and consider the full range of site specific impacts on the human environment; cumulative and secondary impacts; and a reasonable range of alternatives;

3. For a declaratory judgment that the Defendants' decision to ship partially treated VX hydrolysate across state lines is arbitrary, capricious, and otherwise not in accordance with law in violation of the Administrative Procedure Act and statutes governing the handling and destruction of the Nation's biological and chemical weapons stores

4. For an order setting aside any findings or decisions by Defendants regarding the use of the DuPont facility to treat and dispose of VX or VX hydrolysate, as well as any contract, to treat and dispose of VX or VX hydrolysate at the DuPont facility in Deepwater, New Jersey;

5. For an order enjoining Defendants from shipping any VX hydrolysate to the DuPont facility in Deepwater, New Jersey pending full compliance with the National Environmental Policy Act;

6. For the Court to retain continuing jurisdiction to review defendants' compliance with all judgments and orders entered herein;

7. For an award of Plaintiffs' costs of litigation, including reasonable attorney's fees; and

8. For such other and further relief as the Court may deem just and proper to effectuate a complete resolution of the legal disputes between Plaintiffs and Defendants.

DATED:        December 20, 2006                    Respectfully Submitted,

/s/_____
JOHN ANDREW FRITSCHIE
D.C. Bar No. 442624
Delaware Riverkeeper Network
River Resources Law Clinic
300 Pond Street
Bristol, Pennsylvania 19007
Phone: (267) 390-4138
Facsimile: (215) 369-1181

Attorney for Plaintiffs

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

The Delaware Riverkeeper, et al.,

## DEFENDANTS

United States Army and Secretary of Defense

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF      Bucks
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John Andrew Fritschie
Delaware Riverkeeper Network
River Resources Law Clinic
300 Pond Street
Bristol, PA 19007

ATTORNEYS (IF KNOWN)

United States Attorney General

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

● 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust

☐ 410 Antitrust

### ○ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ● C. Administrative Agency Review

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

### ○ E.  General Civil (Other)      OR      ○ F.  Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Violations of National Environmental Policy Act, 42 UUSC 4331 et seq and Defense Auth. Acts, 50 USC 1512 et seq. pursuant to APA 5 USC 706

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ [ 0 ] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐   NO ☒ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE   12/20/06      SIGNATURE OF ATTORNEY OF RECORD    _(signature)_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.